FILED

2021 Mar-30  AM 11:30
U.S. DISTRICT COURT
N.D. OF ALABAMA



# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

|  |  |  |
|---|---|---|
| **DOUG KILLOUGH and** | ) | |
| **TECHNICAL CONSULTING** | ) | |
| **SOLUTIONS, INC.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | Civil Action Number |
| **vs.** | ) | **5:17-cv-00247-AKK** |
| | ) | |
| **PHIL MONKRESS and ALL** | ) | |
| **POINTS LOGISTICS, LLC,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM OPINION</u>

This action arises from an employment agreement between Doug Killough, the owner of Technical Consulting Solutions, Inc. ("TCS"), and All Points Logistics, LLC ("APL"), a company owned by Phil Monkress.  Killough and TCS assert claims against Monkress and APL for allegedly failing to pay Killough all the profits he was owed on contracts he generated for APL and for breaching an agreement to transfer those contracts to TCS.  Doc. 41.  For its part, APL asserts counterclaims for alleged misappropriation of its trade secrets and interference with its business relations by, among other things, usurping its customers and purloining APL's confidential and proprietary documents.  Doc. 54 at 30-63.  The court has the parties' cross-motions for summary judgment for consideration—Killough and TCS's

motion on all of APL and Monkress's counterclaims, doc. 80, and APL and Monkress's motion on all of Killough and TCS's claims, doc. 82.   For the reasons explained below, each motion is due to be granted in part.

## I.

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56. "Rule 56[] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (alteration in original).  The moving party bears the initial burden of proving the absence of a genuine issue of material fact.  *Id*. at 323.  The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish that there is a "genuine issue for trial."  *Id*. at 324 (citation and internal quotation marks omitted).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

On summary judgment motions, the court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving

party.  *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970).  *See also Anderson*, 477 U.S. at 255.  Any factual disputes will be resolved in the non-moving party's favor when sufficient competent evidence supports the non-moving party's version of the disputed facts.  *See Pace v. Capobianco*, 283 F.3d 1275, 1276, 1278 (11th Cir. 2002) (a court is not required to resolve disputes in the non-moving party's favor when that party's version of events is supported by insufficient evidence).  However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion."  *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989)).  Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party."  *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

## II.

Prior to joining APL, Killough worked for Booz Allen Hamilton, a government contractor, providing engineering services to Boeing in support of missile defense contracts Boeing held with the federal government.  *See* docs. 85-1 at 13-14; 96-1 at 2.  When Booz Allen withdrew from that market, Killough and a fellow employee decided to start a new company, TCS, to try to continue working on missile defense contracts.  Docs. 85-1 at 13-14; 88-1 at 11; 96-1 at 2; 96-3 at 8.

As part of that process, Killough and his partner met with Monkress to discuss a potential joint venture with APL to enable Killough to continue servicing the Boeing contract while also helping APL build a new team providing missile defense services.  Docs. 85-1 at 15, 23; 88-1 at 13; 96-3 at 12-13.

Monkress and Killough first discussed working together under a mentor-protégé arrangement in which APL, Monkress's company, would serve as the mentor for TCS.  Doc. 88-1 at 12-13, 15, 17.  Then, the parties changed course and reached an agreement for Killough to work for APL as an engineer servicing missile defense contracts for prime contractors and developing that business for APL while also setting up his own business, TCS.  *See* docs. 96-1 at 3; 88-1 at 16-17; *see also* doc. 84-8.  Though the parties dispute the specific terms of their agreement, Monkress and Killough agree that they initially settled on an arrangement where APL would subcontract to TCS the missile defense work that Killough generated for APL when Killough felt that TCS could take on the work.  Docs. 85-1 at 15, 17, 21; 88-1 at 16-17.  APL also agreed to pay Killough a bonus of 50% of the net profits on the contracts he generated.  Docs. 85-1 at 20-21, 52; 84-12 at 9; 96-1 at 3.[1] According to Killough, APL learned subsequently that it could not subcontract the missile defense contracts to TCS, and Monkress and TCS agreed instead to transfer

---

[1] APL and Killough negotiated an employment agreement that Monkress and Killough signed in June 2010, *see* docs. 84-8; 85-1 at 24-25, but which Killough did not return.  Killough contends that the parties reached only an oral agreement as a result.  Docs. 96-1 at 3; 85-1 at 24-25, 52.

or novate the contracts to TCS once TCS had the appropriate security clearance, approvals, and business structure in place.  Docs. 85-1 at 15-16, 26, 34; 96-1 at 3.[2]

During his five-year employment with APL, Killough worked as a program manager and principal engineer.  Doc. 84-1 at 3.  In this capacity, Killough helped APL obtain contracts with three prime contractors:  Boeing, Northrop Grumman, and Teledyne Brown.  Docs. 96-1 at 3-4; *see also* doc. 85-1 at 30.  In November 2014, he contacted all three about transferring their contracts with APL to TCS, and each expressed a willingness to move ahead with the transfer.  *See* docs. 84-13 at 1; 85-1 at 26-27; 97-4 at 2.  Killough then told Monkress that he wanted APL to transfer the contracts to TCS, and that the prime contractors had agreed to the transfer.  Docs. 85-1 at 32-33; 88-1 at 27; 84-13 at 1.  Three days later, APL discharged Killough for alleged insubordination.  Docs. 85-1 at 33; 88-1 at 27-28; 88-3 at 27-28.

Killough's discharge caused Northrop to express concerns about APL's ability to successfully complete the contract.  *See* docs. 88-1 at 29-30; 88-3 at 27-29; 88-8 at 42.  As a result, APL rehired Killough.  Docs. 88-1 at 29-30; 88-3 at 28-29.  According to Killough, he agreed to return to APL after Monkress orally agreed that APL would eventually novate the contracts at issue to TCS.  *See* doc. 85-1 at

---

[2] Monkress and APL dispute the novation allegations, and Monkress contends that the parties simply agreed to eventually negotiate a subcontract agreement.  Doc. 88-1 at 17-18, 27-28; 84-1 at 9; 88-3 at 28, 31.

33, 57.  Despite this purported agreement, APL and Monkress insisted that Killough sign an employment agreement that did not include any terms about novating or subcontracting the contracts.  *See* docs. 88-1 at 30; 88-3 at 30, 33; 84-19; 84-21; 84-22; *see also* doc. 84-1 at 5.   Killough refused, and APL eventually removed Killough's managerial responsibilities in August 2015.  *See* docs. 88-1 at 30; 88-3 at 33, 37-38; 84-1 at 5; 81-3 at 2.  After that change, Killough's only task for APL was to finish the Northrop project.  Docs. 81-3 at 2; 88-3 at 38.  And, when that project closed, his employment at APL also ended.  *See* doc. 88-3 at 38.

In the year before Killough's employment at APL ended,  Killough contacted Northrop using his TCS email account and inquired about a facility security clearance for TCS, and he asked Northrop for job descriptions for available positions and expressed concern when he learned Northrop sent them to his APL email account.  Docs. 85-1 at 86; 85-24 at 3; 85-26 at 4.  Killough also applied for TCS to become an approved supplier for Northrop and sent a proposed statement of work, which he designed to be broad enough to allow TCS "to be able to help out wherever needed."  Docs. 85-24 at 12-13; 85-51 at 7; 85-106 at 39; 88-45 at 15-16, 51; 98 at exhs. Q, S.  In Killough's last month with APL, Northrop and Killough reached an agreement that TCS could perform for Northrop the same work Killough performed for Northrop as an APL employee.  *See* docs. 85-106 at 17; 85-45 at 31-32; 98 at exh. U.  Killough then submitted proposed labor rates to Northrop on behalf of TCS

that were identical to APL's rates.  Docs. 88-17 at 9, 31; 98 at exh. A, ¶ 64.  Northrop

used the rates to estimate a ceiling value for the contract it ultimately awarded to

TCS.  Doc. 85-45 at 52.  After Killough began working for Northrop as a TCS

employee, APL did not place any other personnel with Northrop, and Northrop

elected not to extend to its contract with APL when the contract expired.  Doc. 98 at

exh. A, ¶¶ 22, 27; *see also* doc. 85-45 at 38.

## III.

Killough and TCS assert claims against APL and Monkress for breach of

contract (Count I), misrepresentation (Count II), suppression (Count III), quantum

meruit (Count V), conversion (Count VI), and unjust enrichment (Count VII).  Doc.

41 at 17-25, 17-31.[3]  For its part, APL pleads counterclaims for violations of the

federal and state trade secrets acts (Counts I and II), conversion of confidential

documents (Count III), tortious interference with business relations (Count IV),

breach of fiduciary duty (Count V), and breach of contract (Count VI).  Doc. 54 at

44-63.  The court turns now to the parties' respective contentions regarding each of

the claims and counterclaims, beginning with the plaintiffs' breach of contract

claims.

---

[3] The court previously dismissed the plaintiffs' promissory fraud claim (Count IV).  Doc. 50.

## A.

To prove their breach of contract claims, TCS and Killough must establish: "a valid contract binding the parties; [] the plaintiffs' performance under the contract; [] the defendant's nonperformance; and [] resulting damages." *Shaffer v. Regions Fin. Corp.*, 29 So. 3d 872, 880 (Ala. 2009) (quotation omitted).  A valid contract requires "'an offer and an acceptance, consideration, and mutual assent to terms essential to the formation of a contract.'"  *Id.* (quotation omitted).

## 1.

TCS and Killough allege APL breached the contract, in part, by failing to pay Killough the correct amount of net profits for certain contracts he generated.  Under the agreement, APL agreed to pay Killough "50% of net profits . . . ."  Doc. 69 at 4. The dispute here centers on the costs that APL can charge to each contract Killough generated.  APL contends that it correctly determined the amount of "net profits" to pay Killough by properly utilizing generally accepted accounting principles that define net profits as "net income after <u>all costs</u> are accounted for."  Docs. 83 at 11-13; 88-3 at 18 (emphasis added).  APL adds that Killough cannot show that it inflated costs to reduce his profit share.  Doc. 83 at 11-12.

For their part, Killough and TCS contend that the phrase "50% of net profits <u>of project</u>" in Addendum A of the employment agreement does not include certain "unallowable costs," doc. 97-1 at 19-20; *see also* doc. 69 at 4 (emphasis added), and

they rely on their expert, Kandy Gardner, for this contention, *see* doc. 88-10 at 27-28, 31.  Gardner added that there is no generally recognized definition of net profits, and that the meaning of the phrase is "something that's left up to the parties."  Doc. 88-10 at 27.  Killough adds that he understood that APL would calculate the net profit on his contracts using only the overhead and general and administrative expenses associated with his specific contracts.  Doc. 88-6 at 33.  These contentions are sufficient to create a question of fact regarding whether APL purportedly included "unallowable costs," i.e., the overhead and expenses associated with other contracts, in its calculation of Killough's net profits for the particular contracts he generated.  As a result, summary judgment is due to be denied on the claim that APL breached the contract by purportedly failing to pay Killough the correct amount of net profits.

## 2.

TCS and Killough allege also that APL failed to pay Killough net profits in 2015.  APL contends that it "changed the terms of Killough's compensation prior to his being rehired [in 2014] and no longer paid him [in 2015] for the net profits when he refused to agree to [a] written agreement."  Doc. 83 at 19.  But, this contention ignores that APL did not tell Killough that he needed to sign and return a contract until <u>after</u> it rehired him.  *See* doc. 88-3 at 13, 15, 30.  Moreover, Killough insists that (1) Monkress reaffirmed the parties' "initial verbal agreement," which allegedly

includes the profit-sharing provision, when Killough agreed to return to APL in 2014, doc. 85-1 at 57; (2) APL paid him a commission for profits on contracts after it rehired him, *see* doc. 96-2 at 2-3; and (3) an APL employee indicated that APL would pay him profits in 2015, docs. 97-5 at 2-9; 97-6 at 2.  This evidence creates a question of fact regarding whether APL in fact agreed to continue to pay Killough net profits for 2015.

### 3.

Finally, TCS and Killough allege a breach based on APL's refusal to transfer the contracts at issue to TCS.  APL contends that the purported agreement to transfer is unenforceable for three reasons, which the court addresses separately below.

#### a.

APL asserts first a lack of consideration defense.  Doc. 83 at 16.  "'To constitute consideration, a performance or a return promise must be bargained for,' and '[a] performance or return promise is bargained for if it is sought by the promisor in exchange for his promise and is given by the promisee in exchange for that promise.'"  *Smith v. Wachovia Bank, N.A.*, 33 So. 3d 1191, 1197 (Ala. 2009) (quoting Restatement (Second) of Contracts § 71(1) and (2)) (emphasis in original omitted).  At issue here is APL's contention that Killough offered nothing in exchange for the alleged promise to novate other than services he was required to provide as APL's employee.  The record shows that the parties initially agreed that

Killough would work and develop business for APL and that, in exchange, APL would pay Killough a salary and bonus.[4]  *See* docs. 85-1 at 17, 21, 24, 28; 91-1 at 106.  And, as to the contracts at issue, the written employment agreement states in part that, after certain conditions were met, APL "will agree to transfer the existing work being performed by [Killough] to the new business entity [i.e., TCS] in a sub contract agreement with [APL]."[5]  Docs. 69 at 5; 84-8 at 10; 84-5 at 11; 84-6 at 11; 85-4 at 5; 85-5 at 7.  Thus, contrary to APL's contention, Killough's agreement to work for APL is consideration to support the initial agreement to subcontract the work to TCS.  *See Wachovia Bank*, 33 So. 3d at 1197.

According to Killough, APL agreed to amend the agreement to novate the contracts to TCS when APL learned that subcontracting was not an available option.  Docs. 85-1 at 15-16, 20-21, 24, 28; 91-1 at 106.  Though Monkress and APL adamantly deny that they agreed to transfer rather than subcontract work to TCS, *see* docs. 88-1 at 17-18, 27-28; 88-3 at 28, 31, Killough's testimony creates a question

---

[4] Kiriakos Sarris, Killough's TCS partner, testified that when they met with Monkress initially to discuss a joint venture, Monkress told him and Killough that APL would transfer or novate the contracts to TCS because Boeing would not accept a subcontract agreement.  Doc. 96-3 at 14-16.  Nevertheless, Killough and TCS did not dispute APL's statement that the parties only discussed at the initial meeting APL's subcontracting the work at issue.  *See* docs. 83 at 3; 97-1 at 8.

[5] Killough contends that because he did not return the signed contract to APL, doc. 85-1 at 24, he did not assent to the terms of the contract, *see* doc. 97-1 at 8, 18.  But, Killough does not cite any authority to support that contention, *see* doc. 97-1, and Alabama law is clear that "[t]he purpose of a signature on a contract is to show mutual assent . . . ." *Ex parte Rush*, 730 So. 2d 1175, 1177-78 (Ala. 1999) (citations omitted).  Thus, Killough's signature on the contract is evidence of his assent to the terms of the written contract even if he did not deliver the contract to APL.

of fact regarding whether there was mutual assent for the alleged amendment to the agreement. And, under Alabama law, "[p]arties to a written contract may by mutual consent <u>without other consideration</u> orally alter, modify or rescind the contract." *Watson v. McGee*, 348 So. 2d 461, 464 (Ala. 1977) (citing *Allied Mills, Inc. v. St. John*, 152 So. 2d 133 (Ala. 1963)) (emphasis added). Thus, because consideration supports the initial agreement and a dispute exists regarding if the parties assented to a change in the agreement, the lack of consideration defense fails at this juncture.[6]

b.

APL contends also that the alleged novation change is an unenforceable agreement to agree and one that gave Killough and TCS complete discretion to determine when it would occur. Doc. 83 at 14-16, 18. Indeed, "'[t]o be enforceable, the essential terms of a contract must be sufficiently definite and certain, [] and a contract that leaves material portions open for future agreement is nugatory and void for indefiniteness[.]' . . . 'In particular, a reservation in either party of a future unbridled right to determine the nature of the performance has often caused a promise to be too indefinite for enforcement.'" *White Sands Group, L.L.C. v. PRS II, LLC*, 998 So. 2d 1042, 1051 (Ala. 2008) (quotations, emphasis, and alterations in

---

[6] APL and Monkress contend that substantial consideration "separate from the services to be rendered" must support the alleged agreement to novate. Doc. 83 at 16. But, the cases they cite are inapposite because they relate to what an employee must show "[t]o establish that an employment agreement is one other than one terminable at will . . . ." *Hoffman-LaRoche, Inc. v. Campbell*, 512 So. 2d 725, 728 (Ala. 1987); *see also Hopkins v. ADT Sec. Servs.*, Civ. Action No. 2:12-cv-00518-AKK, 2013 WL 19009416, at *5 (N.D. Ala. May 8, 2013).

original omitted).  Here, however, the purported agreement had a definite date—when TCS had the proper business structure and security clearances in place and was ready to take on the work.  *See* docs. 85-1 at 15, 17; 96-1 at 3-4.  And because Monkress acknowledged that novating the contracts to TCS would leave APL with no role in the contracts after the transfer, *see* doc. 88-1 at 18, APL's contention that the purported agreement is indefinite because it does not identify APL's role is unavailing.

Nor has APL shown that the alleged agreement to novate is a non-binding illusory promise.  APL correctly notes that a party's "unlimited right to determine the nature and extent of his performance" renders a contract "too indefinite for legal enforcement," *Smith v. Chickamauga Cedar Co.*, 82 So. 2d 200, 202 (Ala. 1955), and that Killough testified that APL agreed to novate the contracts to TCS when Killough "felt [he] was ready to take them on [him]self," doc. 85-1 at 15.  But, the novation or transfer of the contracts was <u>not</u> Killough's performance under the alleged agreement. Rather, the agreement required Killough to work for APL, including by developing the missile defense business, *see* docs. 84-1 at 3-4; 84-12 at 1-2; 88-1 at 16-17, and APL cited nothing to suggest that Killough could decide the nature or extent of his work, *see* doc. 83.  Thus, on this record, APL has not shown that Killough had complete discretion to determine the nature of his

performance and that the alleged agreement is an illusory promise, or that it is an indefinite agreement to enter into a future contract.

c.

Finally, APL contends that the affected prime contractors did not consent to the novation, doc. 83 at 17, which is a prerequisite before APL could transfer the contracts to TCS, *see* doc. 85-1 at 29. Indeed, the contractors had not consented before APL discharged Killough. *See* docs. 88-18 at 24; 88-34 at 11. But, Killough testified that those prime contractors expressed a willingness to transfer the contracts from APL to TCS before APL discharged Killough. *See* doc. 85-1 at 26-27. And he alleges that APL discharged him because he sought the novation and, in doing so, frustrated his attempt to obtain the contractors' consent for the novation. *See id.* at 33. "[A] party to a contract cannot rely on the failure of another to perform a condition precedent where he has frustrated or prevented the occurrence of the condition." *Kooleraire Serv. & Installation Corp. v. Bd. of Ed. of New York*, 268 N.E. 2d 782, 784 (N.Y. 1971) (citation omitted).[7] Thus, because Killough's testimony creates a question of fact regarding whether APL may have frustrated his

_____

[7] *See also Ex parte Birmingham Fire Ins. Co.*, 172 So. 99, 101 (Ala. 1937) ("If the appraisal should fail, by reason of the fault of the insurer, and without fault on the part of the insured, the insured may bring his action on the policy to recover the loss, notwithstanding the policy provides that the loss shall be ascertained by appraisers and that no suit shall be commence 'until after full compliance by the insured with all the foregoing requirements . . . .' The insurer will not be allowed to take advantage of his own wrong in preventing the making of an award by the appraisers.").

ability to obtain the contractors' consent to the novation, the purported lack of consent defense fails at this juncture.

*     *     *

To summarize, Killough and TCS have shown a question of fact regarding whether APL breached the contract by not paying Killough any net profits in 2015 and the correct amount of net profits in the prior years.  The record also shows an issue of fact regarding whether the alleged agreement to novate is indefinite and supported by consideration, and whether APL frustrated Killough's ability to obtain the prime contractors' consent to the novation.  Thus, APL's motion on the breach of contract claim fails.

## B.

In Counts II and III, Killough asserts fraudulent misrepresentation and suppression claims against Monkress and APL based on financial statements that purportedly overstated costs and concealed the true costs associated with the TCS-related contracts from Killough.   Doc. 41 at 9-11, 20-25.   To prove misrepresentation, Killough must show that APL and Monkress made a false representation about a material fact, he relied on the representation, and suffered actual damages as a result.  *Spooner v. State Farm Mut. Auto. Ins. Co.*, 709 So. 2d 1157, 1160 (Ala. 1997).  Proving the suppression claim requires showing that APL and Monkress suppressed an existing, material fact they had knowledge of and a

15

duty to disclose, that Killough's lack of knowledge induced him to act, and that he suffered actual damages as a result. *Hardy v. Blue Cross & Blue Shield*, 585 So. 2d 29, 32 (Ala. 1991). And, to prove actual damages for either claim, Killough must show he suffered "damage due to fraud that is separate from damages that may result from any subsequent contractual breach." *Dickinson v. Land Developers Construction Co.*, 882 So. 2d 291, 305 (Ala. 2003) (J. Houston, concurring (citing *Deupree v. Butner*, 552 So. 2d 242, 245 (Ala. 1988)) (emphasis and quotation omitted).

APL and Monkress contend, among other things, that Killough failed to show he suffered any damages from the alleged fraud separate from the alleged breach of contract damages. Doc. 83 at 24-25. Indeed, Killough asserts that the alleged misrepresentation and suppression caused him to accept less than the share of the profits he was entitled to under the parties' agreement. Docs. 41 at 13, 22, 25; 85-1 at 39-40, 68-69, 88. These are the same damages he claims for the alleged breach of contract, *see* doc. 41 at 17-18, and his alternative contention that the alleged fraud also injured him by causing him to "continue working for a fraudster" instead of requesting a novation, doc. 97-1 at 32, is unavailing. Killough points to no evidence suggesting that he could have requested the novation any earlier than he did or that he delayed doing so because of the alleged fraud. *See* doc. 97-1. Consequently, because Killough has not shown he suffered damages due to the alleged fraud that

are separate from his breach of contract damages, his fraudulent misrepresentation and suppression claims fail as a matter of law.[8]

## C.

In Count V, Killough asserts a quantum meruit claim against APL based in part on his allegations that APL knowingly accepted the benefit of his services and failed to reasonably compensate him.  Doc. 41 at 28.  To prevail on this claim, Killough must show that he provided services that APL knowingly accepted, and that he had a reasonable expectation of compensation for his services.  *Mantiply v. Mantiply*, 951 So. 2d 638, 656 (Ala. 2006).  But, the existence of an express contract for the services at issue generally precludes a plaintiff from recovering under a theory of quantum meruit.  *See Carroll v. LFC Def. Contracting, Inc.*, 24 So. 3d 448, 458 (Ala. Civ. App. 2009) (citation omitted).  And, here, APL contends the quantum meruit claim arises out of the parties' express contract, doc. 83 at 25-26, a fact Killough does not dispute.  Still, Killough contends that his claim survives based on the parties' dispute regarding whether their contract terminated in 2014 or in 2015.

---

[8] Killough insists the fraud claims against Monkress should survive independently because he did not have a contract with Monkress, and can seek unpaid profits as damages against Monkress. Doc. 97-1 at 32-33.  Killough does not cite any evidence, however, suggesting Monkress—not APL—is responsible for the allegedly inflated costs in the quarterly profit statements.  In fact, Killough explicitly states that "APL falsely represented costs" and "APL concealed the true overhead and G&A costs," *id.* at 29-30, and that APL prepared and provided the quarterly statements containing the allegedly inflated costs, *id.* at 15.  As a result, because Killough did not show that Monkress misrepresented or suppressed any fact, the fraud claims against Monkress also fail.

*See* doc. 97-1 at 33-34.  According to Killough, if the factfinder agrees with APL and finds that the contract terminated in 2014 after APL rehired Killough, then Killough may be entitled to a share of the profits for 2015 under a theory of quantum meruit.  *Id.*  In particular, Killough contends that he had a reasonable expectation that APL would continue to pay him 50% of the net profits on certain contracts when he agreed to return to APL, and APL never paid him those profits.  *Id.*; *see also* doc. 85-1 at 57 (testifying that the parties reaffirmed parts of their general agreement when Killough returned to APL).

APL counters that Killough's argument does not relate to the quantum meruit claim as pleaded,[9] and that it is improper for him to amend the claim now.[10]  Doc. 105 at 9.  But, Killough's argument that APL did not pay him profits in 2015 is not a new theory of recovery or a fundamental change to his claim.  Rather, Killough is simply limiting his claim to seek damages for unpaid profits to a single year.  Because APL denies that it agreed to pay Killough net profits in 2015, *see* doc. 84-1 at 6, and Killough's testimony creates a question of fact regarding whether he

---

[9] The complaint pleads:  "Killough rendered services for over five years to APL, and [] APL knowingly accepted the benefit of those services.  . . .  Killough had a reasonable expectation of being compensated a reasonable amount of money for the services provided to APL.  APL failed to provide a reasonable amount of money to compensate Killough for the services provided. Further, any compensation provided was unreasonable compared to the services rendered."  Doc. 41 at 28.

[10] "In this circuit, a plaintiff cannot amend his complaint through argument made in his brief in opposition to the defendant's motion for summary judgment."  *Miccosukee Tribe of Indians of Fla. v. United States*, 716 F.3d 535, 559 (11th Cir. 2013).

reasonably expected payment of those profits, *see* doc. 85-1 at 57, his quantum meruit claim related to unpaid profits from 2015 survives summary judgment.

## D.

In Count VI, TCS asserts a conversion claim based on allegations that APL converted the contracts Killough generated by refusing to transfer them to TCS. Doc. 41 at 29.  For a conversion claim, "a plaintiff must show a wrongful taking, an illegal assumption of ownership, an illegal use or misuse of another's property, or a wrongful detention or interference with another's property." *Huntsville Golf Dev., Inc. v. Ratcliff, Inc.*, 646 So. 2d 1334, 1336 (Ala. 1994) (citation omitted).  "The gist of the action is the wrongful exercise of dominion over property in exclusion or defiance of a plaintiff's rights, where said plaintiff has general or specific title to the property or the immediate right to possession." *Ott v. Fox*, 362 So. 2d 836, 839 (Ala. 1978) (citation omitted).   Although TCS concedes that it did not have title to the contracts, TCS argues that it had an immediate right to possession and had a contractual right to have title to the contracts.  *See* doc. 97-1 at 34-35.  But, the record reveals that TCS could not assume ownership until the third-party prime contractors agreed to novate or transfer the contracts from APL to TCS.  *See* doc. 84-13 at 1-5; 85-1 at 26-27; 97-4 at 2.  And, while Killough contends that the contractors had consented, he and TCS do not point to any evidence to suggest the prime contractors had given their final consent to the novation, *see* doc. 97-1, or that he tried to execute

the novation after he returned to APL in 2014 and before he left in 2015. As a result, TCS has failed to establish that it had an immediate right to possess the contracts at issue, and the conversion claim fails as a matter of law.

## E.

Finally, Killough asserts in Count VII an unjust enrichment claim against APL based in part on his allegations that APL retained the benefits of contracts Killough generated without adequately compensating him. Doc. 41 at 30-21.[11] "To prevail on a claim of unjust enrichment under Alabama law, a plaintiff must show that: (1) the defendant knowingly accepted and retained a benefit, (2) provided by another, (3) who had a reasonable expectation of compensation." *Matador Holdings, Inc. v. HoPo Realty Investments, L.L.C.*, 77 So. 3d 139, 145 (Ala. 2011) (quotation omitted). "Retention of a benefit is unjust if (1) the donor of the benefit acted under a mistake of fact . . . , or (2) the recipient of the benefit engaged in some unconscionable conduct, such as fraud, coercion, or abuse of a confidential relationship." *Id.* at 146 (quotation and alteration in original omitted).

Here, APL contends that Killough's unjust enrichment claim fails because APL paid him a salary for his work and a share of net profits on the contracts. *See*

---

[11] The plaintiffs contend in their brief that TCS and Killough assert the unjust enrichment claim against APL. Doc. 97-1 at 36. But, the Third Amended Complaint explicitly states "Killough alleges a claim of unjust enrichment against APL," doc. 41 at 29, n.10, and the unjust enrichment claim's ad damnum clause states that only "Killough demands judgment against APL for compensatory and punitive damages plus interest," *id.* at 31.

doc. 83 at 30-32.  Killough does not directly refute those contentions, but argues instead that APL discharged him when he asked for the novation.  *See* docs. 85-1 at 32-33; 97-1 at 36.  As Killough puts it, APL's retention of the contracts and the profits is unjust.  Doc. 97-1 at 36.  But, as APL points out, s*ee* doc. 105 at 10-11, the unjust enrichment claim Killough pleaded does not mention APL's alleged promise to novate the contracts, or that APL failed to novate the contracts and discharged Killough when he asked APL to satisfy its alleged promise, *see* doc. 41 at 29-31.[12] Killough cannot amend his claim through a summary judgment brief.  *See, e.g., Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 859 (11th Cir. 2020) (citing *Miccosukee Tribe of Indians of Fla.*, 716 F.3d at 559).  Moreover, "grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (citations omitted).  Thus, APL is entitled to summary judgment because Killough has abandoned the unjust enrichment claim as pleaded.

*     *     *

To summarize, as to Killough and TCS's claims, APL's motion for summary judgment is denied as to the breach of contract claims (Count I) and the quantum

---

[12] The complaint pleads that "APL knowingly accepted and retained a benefit in the form of the TCS-related contracts that Killough obtained and worked with Defendants to fulfill" and "[d]efendants owe the [p]laintiffs the reasonable value for the contracts described above and for the work done and expertise provided for APL . . . ."  Doc. 41 at 30.  Those allegations are not sufficient to put APL on notice that the unjust enrichment claim is based on the failure to novate.

meruit claim related solely to net profits for 2015 (Count V).  In all other respects, APL's motion is granted.

**F.**

For its part, APL asserts in Counts I and II of its counterclaims that Killough and TCS violated the Defense of Trade Secrets Act ("DTSA") and the Alabama Trade Secrets Act ("ATSA").  Allegedly, Killough and TCS took APL's trade secrets (in particular, APL's labor rates) and used them in competition with APL in bidding for contracts with Northrop.  Doc. 54 at 44-48; *see also* doc. 102 at 8, 16.

Damages available under the DTSA and ATSA are for the actual loss and unjust enrichment caused by the misappropriation of trade secrets.  18 U.S.C. § 1836(b)(3)(B); Ala. Code § 8-27-4(a)(1).  TCS and Killough argue that APL cannot show that the misappropriation and submission of APL's labor rates to Northrop conferred any financial benefit to TCS and Killough or caused APL to lose any profit.  Doc. 85 at 18-19.  To support that contention, TCS and Killough correctly note that Northrop rejected the misappropriated labor rates that they submitted.  *See* doc. 85-105 at 2-3.  Still, Northrop used those rates as a ceiling when setting the value for the contract TCS ultimately received for Killough to perform work for Northrop that he originally performed as an APL employee.  *See* doc. 84-45 at 52. In addition, Killough's labor rate in TCS's January 2016 contract with Northrop was exactly 35% less than APL's 2016 labor rate for principal engineer, which, according

to APL's expert, is not likely a coincidence.  Docs. 88-17 at 30-31; 98 at exh. G,

101-06.  Northrop's use of the allegedly misappropriated labor rates that Killough

and TCS submitted to Northrop creates questions of fact regarding whether the

alleged conduct helped TCS secure a contract with Northrop, and harmed APL or

caused Killough and TCS to be unjustly enriched.  Consequently, Killough and

TCS's motion on the DTSA and ATSA counterclaims is due to be denied.

## G.

Summary judgment is due, however, on APL's claim in Count III of its

counterclaim that Killough and TCS converted its confidential documents.  Doc. 54

at 49-50.  The ATSA preempts any common law conversion claim based on the

misappropriation of trade secrets.  The ATSA "'is intended to both codify and to

modify the common law of trade secrets in Alabama,'" and a plaintiff cannot "pursue

both statutory and common law theories of recovery for the defendants' alleged

misappropriation of 'trade secrets' or confidential documents."  *Allied Supply Co.,*

*Inc. v. Brown*, 585 So. 2d 33, 37 (Ala. 1991) (quotation omitted).  Thus, "any

common law tort claim that, whatever its name, provides a theory of recovery for

the misappropriation of a trade secret is preempted by [the] ATSA."  *Arkema Inc. v.*

*Emerson Process Mgmt., LLLP*, 413 F. Supp. 3d 1191, 1194 (S.D. Ala. 2019).[13]  And

---

[13] APL contends that *Acoustic Artistry, LLC v. Peavey Electronics Corp*, 2:10-cv-02194-AKK,
2013 WL 12250381 (N.D. Ala. Jan. 10, 2013), compels a finding that the ATSA preempts only
common law misappropriation claims rather than other tort claims like conversion.  Doc. 102 at

because APL's conversion claim seeks recovery for the misappropriation of its confidential documents and information, *see* doc. 54 at 49-50, it is preempted by the ATSA.

APL attempts to avoid that conclusion by contending that it is challenging the taking of its physical property, i.e., confidential documents. Doc. 102 at 18. Such a claim still fails. The Alabama Supreme Court has found that the ATSA precludes common law claims for the "alleged misappropriation of 'trade secrets' <u>or</u> <u>confidential documents</u>." *Allied Supply Co., Inc.*, 585 So. 2d at 37 (emphasis added). Moreover, the case APL cites hinged on whether "the converted property has value independent of the value it accrues as a trade secret." *Southern Field Maintenance & Fabrication LLC v. Killough*, 2019 WL 360515, at *5 (M.D. Ala. Jan. 29, 2019) (citing *Diamond Power Int'l, Inc. v. Davidson*, 540 F. Supp. 2d 1322, 1345 (N.D. Ga. 2007)). There is no evidence before the court indicating that the confidential

---

18. In that case, the court allowed the plaintiff's conversion claim to proceed past a motion for judgment on the pleadings because the Supreme Court of Alabama had allowed conversion claims to proceed with claims arising under the ATSA in at least two cases. 2013 WL 12250381 at *8 (citing *Sevier Ins. Agency, Inc. v. Willis Corroon Corp.*, 711 So. 2d 995 (Ala. 1998) and *Soap Co. v. Ecolab, Inc.*, 646 So. 2d 1366 (Ala. 1994)). But, as Judge Steele recently noted, the defendants in the two cases the court cited in *Acoustic Artistry* did not argue that the ATSA preempted the plaintiffs' conversion claims and, therefore, the Supreme Court did not address the issue of preemption. *See Arkema Inc.*, 413 F. Supp. 3d at 1195. Moreover, the court agrees with Judge Steele that "*Allied Supply* did not use the quoted phrase ['common law misappropriation cause of action'] to restrict preemption to a single cause of action traveling under a particular name but rather as a shorthand to describe any tort claim brought to redress the misappropriation of a trade secret." *Id.* at 1194. Thus, the court finds that the ATSA preempts any common law tort claim for the misappropriation of trade secrets, including conversion claims. *See Allied Supply*, 585 So. 2d 37.

documents that form APL's conversion claim, *see* doc. 54 at 49-50, have value independent of the information contained within them, *see* docs. 54; 102. Consequently, APL's common law conversion claim is preempted by the ATSA.

## H.

APL asserts in Count IV of its counterclaim that, after it discharged Killough, he and TCS wrongfully interfered with its contractual and business relations with Northrop.  Doc. 54 at 50-55.[14]  Allegedly, Killough and TCS used confidential knowledge Killough gained as an APL employee to:  influence Northrop's staffing decisions; procure a contract for TCS to supply Northrop with personnel doing the same work APL provided; and influence Northrop's decision to end APL's contract.  Doc. 54 at 50-55.[15]  To prevail on this claim, APL must show "(1) the existence of

_____

[14] APL argues that its wrongful interference counter claim is also based on actions Killough took during his employment.  Doc. 102 at 20-22.  But, APL cannot amend its counterclaim through its brief.  *Miccosukee Tribe of Indians of Fla.*, 716 F.3d at 559.  Moreover, during Killough's employment at APL, he was arguably not a stranger to APL's contractual and business relations with Northrop Grumman.

APL's contention that Killough interfered with its relationship with Northrop by not informing APL that he had an opportunity to continue working on missile defense contracts for Northrop and by pursuing that opportunity through TCS instead of for APL is unavailing.  Doc. 102 at 10-11, 22.  As APL recognizes, Alabama is an at-will state, and APL had no right or reasonable expectation to Killough's continued employment.  *See Hoffman-LaRoche, Inc.*, 512 So. 2d at 728.

[15] In its counterclaim, APL also alleges that the plaintiffs interfered with its relationship with Northrop by persuading Northrop to stop buying equipment through APL and by informing Northrop that APL is only a "staffing company."  Doc. 54 at 35, 53.  But, APL does not present any evidence related to those allegations, and did not respond to the plaintiffs' arguments for summary judgment on the intentional interference claim based on equipment purchases and Killough's alleged "staffing company" statement.  *See* doc. 102.  Thus, APL has abandoned the claim based on those two allegations.  *See Resolution Trust Corp.*, 43 F.3d at 599.

a protectible business relationship; (2) of which the defendant knew; (3) to which the defendant was a stranger (4) with which the defendant intentionally interfered; and (5) damage." *White Sands Group, L.L.C. v. PRS II, LLC*, 32 So. 3d 5, 14 (Ala. 2009). APL has failed to make the necessary showing.

## 1.

To show the plaintiffs interfered with Northrop's staffing decisions, APL alleges that Killough and TCS influenced Northrop to: (1) "terminate its use of the services of APL Network Engineer Travis Merrell and to hire [Merrell] directly" and to deny APL an opportunity to fill the position vacated by Merrell; (2) deny APL an opportunity to re-fill a position when Thomas Neumann, an APL employee who worked as a network engineer for Northrop, resigned; and (3) reject qualified candidates APL submitted to Northrop to replace Franklin Mitchell, an engineer APL discharged based on Northrop's complaints. Doc. 54 at 34-35, 52. But, APL cites no evidence to support these specific allegations, *see* doc. 102,[16] and it did not dispute Northrop's testimony that Killough did not make or have input into Northrop's decision to hire Merrell directly and that a Northrop employee probably took over the work that Merrell had previously performed as an APL employee, *see*

_____

[16] APL does cite evidence showing that TCS employed Merrell and Neumann after they resigned from APL. *See* doc. 98 at exhs. A, ¶¶ 23-24, M. But, the intentional interference claim is based on Northrop's decisions to hire Merrell directly and to allegedly refuse to allow APL to fill Neuman's position, doc. 54 at 34-35, 52, rather than on TCS hiring APL employees, *see id.* at 50-55.

doc. 85-45 at 41, 65.  Likewise, APL did not challenge Killough's testimony that he played no role in Northrop's decision related to the decision against refilling Neumann's position.  Doc. 85-1 at 62-63.[17]  Moreover, APL did not directly dispute Northrop's corporate representative's testimony that Killough had no input into whether Northrop hired APL candidates and that he did not remember Killough ever saying anything negative about APL or any of the candidates APL submitted.  Doc. 85-45 at 18, 37, 65-67.

APL does offer evidence, however, that Northrop did not accept any APL candidates after Killough's employment with APL ended and that Killough participated in one Northrop interview with a candidate APL presented.  Docs. 102 at 21; 98 at exh. A, ¶¶ 20-25; *see also* docs. 85-1 at 62.  Indeed, Killough sat in on Northrop's interview with Sam Woodson, a candidate APL submitted to fill the position vacated by Merrell.  *See* docs. 85-1 at 62; 85-45 at 60; 98 at exh. A, ¶ 24.  But, according to Killough, he and TCS presented Woodson as a candidate for the position before APL did so, and Northrop and Killough jointly decided that Woodson's technical skills did not match what the position required.  *See* doc. 85-1 at 62.  Killough added that he and Northrop also reached the same conclusion after

---

[17] In addition, Michael Elsner, a Northrop manager in charge of the project Neumann worked on, testified that he did not remember Killough ever asking him not to fill Neumann's position with an APL employee, doc. 88-8 at 43, and Northrop's corporate representative testified that he did not remember Northrop ever hiring Neumann through TCS, doc. 85-45 at 79.

Woodson's interview.  *Id.*  APL offered nothing to rebut these contentions.  *See* doc. 102 at 21-22.[18]  Based on Killough's testimony relating to Woodson and APL's failure to present evidence that Killough and TCS influenced any of Northrop's other staffing decisions, APL has not shown that the plaintiffs interfered with APL's contract with Northrop by improperly influencing its staffing decisions.

## 2.

APL contends also that TCS and Killough interfered with its contractual and business relations by procuring a contract for TCS to supply Northrop with personnel doing the same work APL provided.  In particular, APL alleges that TCS supplied employees for positions at Northrop "that were specific to the APL/Northrop contract" and that the plaintiffs influenced Northrop "to hire at least two TCS employees within the [] scope of APL's contract with Northrop . . . ."  Doc. 54 at 52-53.  Indeed, APL correctly notes that TCS secured a contract with Northrop to provide the same type of work and personnel as APL provided under its contract with Northrop.  *See* docs. 85-45 at 14; 102 at 8-10, 21-22.  But, APL did not cite any evidence to show that it submitted candidates for a position that Northrop filled with a TCS employee.  *See* doc. 102.  And, to the extent that APL bases its claim on

---

[18] APL's corporate representative, Robyn Smith, declares generally that Woodson "was qualified to fill the position," doc. 98 at Ex. A, ¶ 24, but she offers nothing specific regarding his qualifications and does not address Killough's testimony that he and Northrop previously determined Woodson did not have the required technical skills for the position when Killough and TCS presented Woodson as a candidate.

Killough's decision to pursue work at Northrop through TCS rather than through APL, Killough was an at-will employee, and APL had no expectation or right to his continued employment. *See Hoffman-LaRoche, Inc.*, 512 So. 2d at 728. Moreover, APL did not dispute Northrop's testimony that a statement defining the work or type of personnel a subcontractor like APL will supply to Northrop does not guarantee that Northrop will hire any candidate the subcontractor submits. *See* docs. 85-45 at 11-12, 76; 102. APL also did not dispute that Northrop has no obligation under any contract with its subcontractors "to maintain any particular head count level[.]" Doc. 85-45 at 76. Based on this record, APL has not shown that the plaintiffs interfered with APL's contractual and business relations by procuring a contract for TCS to provide personnel and work for Northrop.

**3.**

Finally, APL contends that it had a reasonable expectation that Northrop would extend the parties' contract, and that Killough's and TCS's interference caused Northrop to allow the contract to expire. Docs. 54 at 51, 53-55; 102 at 22. The record establishes that Northrop's own program leadership team decided not to extend APL's contract because APL was no longer providing personnel to support Northrop's missile defense program and had not provided any such personnel "in a while." Doc. 85-45 at 19. While APL believes it would have continued to provide personnel to Northrop and that Northrop would have extended its contract in the

absence of Killough and TCS's interference, *see* doc. 54 at 53-54; 102 at 21-22, APL did not specifically dispute Killough's testimony that Woodson, the sole APL candidate Killough interviewed in conjunction with Northrop, lacked the technical skills for the position APL sought for him at Northrop, *see* docs. 85-1 at 62; 102. And, APL has not shown that Killough and TCS influenced any other decision regarding Northrop's staffing for its missile defense project. *See* Section III(H)(1), *supra*. Thus, APL has not established that the plaintiffs' alleged interference led to Northrop's decision to not extend its contract with APL.

To summarize, APL has not established its prima facie case. APL has failed to show the existence of any disputed issues regarding whether Killough and TCS interfered with APL's contractual and business relations with Northrop Grumman. As a result, Killough and TCS's motion is due to be granted on APL's wrongful interference claim.

## I.

In Count V of its counterclaim, APL asserts a breach of fiduciary duty claim against Killough, alleging that Killough set up a competing enterprise and attempted to usurp APL's business while still employed by APL. Doc. 54 at 55-58.[19] To

---

[19] APL also pleads that Killough breached his fiduciary duty by misappropriating APL's trade secrets and confidential documents and by asking APL's customers to transfer their contracts to TCS. Doc. 54 at 56-57. To the extent that APL's claim is based on the alleged misappropriation of APL's confidential documents, it is precluded by the ATSA. *See Section* III(C), *supra*. Also, the claim based on Killough's attempt to persuade APL's customers to transfer contracts to TCS is barred by the two-year statute of limitations, *see Tender Care Veterinary Hosp., Inc. v. First*

establish the claim, APL must show "the existence of a fiduciary duty, a breach of that duty, and damages suffered as a result of the breach." *Aliant Bank v. Four Star Investments, Inc.*, 244 So. 3d 896, 908 (Ala. 2017) (citing *Regions Bank v. Lowrey*, 101 So. 3d 210, 219 (Ala. 2012)).[20]

## 1.

Killough contends that APL cannot assert a cognizable breach of fiduciary duty claim based on any action he took after APL removed him from his managerial duties. Doc. 85 at 23-29. But, Killough did not cite any Alabama law explicitly limiting fiduciary obligation to employees who are executives, directors, or managers, and the court is not aware of any such authority. Instead, Alabama law recognizes that employees are agents of their employers for actions that fall within the scope of employment, *see Potts v. BE & K Const. Co.*, 604 So. 2d 398, 400 (Ala. 1992), and that "'[i]t is an agent's duty to act, in all circumstances, with due regard for the interests of his principal and to act with the utmost good faith and loyalty,'" *Systrends, Inc. v. Group 8760, LLC*, 959 So. 2d 1052, 1078 (Ala. 2006) (quoting

---

*Tuskegee Bank*, 168 So. 3d 33, 38 (Ala. 2014), and APL abandoned it by failing to respond to Killough's motion, *see Resolution Trust Corp.*, 43 F.3d at 599.

[20] APL contends that it also asserts a breach of the duty of loyalty claim in Count V that is separate from its breach of fiduciary duty claim. Doc. 102 at 29-30. But, APL did not cite any Alabama law indicating that an alleged breach of the duty of loyalty is a separate claim from a breach of fiduciary duty claim. *See* doc. 102 at 30. Rather, the duty of loyalty appears to be part of the fiduciary duty. *See M5Mgmt. Servs., Inc. v. Yanac*, 428 F. Supp. 3d 1282, 1293-94 (N.D. Ala. 2019) (noting that that the plaintiffs assert a breach of fiduciary duty claim and addressing the duty of loyalty as part of that claim)

*Allied Supply Co. v. Brown*, 585 So. 2d 33, 37 (Ala. 1991)).  In addition, under Alabama law, an employee "while engaged in the service of his [employer], has no right to do any act which may injure his trade, or undermine his business . . . ." *Perfection Mattress & Spring Co. v. Dupree*, 113 So. 74, 78 (Ala. 1927) (citation omitted).  This authority belies Killough's contention that fiduciary duty claims are limited to managerial employees.

## 2.

Killough also contends that no breach exists because his alleged conduct consists of seeking employment on his own behalf or preparing to compete with APL after his employment with APL ended.  Doc. 85 at 26-29.  "Implicit in [an agent's fiduciary duty] is an obligation not to subvert the principal's business by luring away customers or employees of the principal, or to otherwise act in any manner adverse to the principal's interest."  *Allied Supply Co.*, 585 So. 2d at 37 (citation omitted).  Nevertheless, "it is not a violation of an employee's fiduciary duty to prepare to enter into competition with his employer without providing prior notice," *id.*, and an employee "is entitled to seek other employment before he is on the street," *Perfection Mattress & Spring Co.*, 113 So. at 78.

Here, the record reveals that while Killough was still an APL employee he (1) contacted Northrop about TCS obtaining a facility security clearance and becoming an approved supplier, doc. 85-106 at 50-51; (2) emailed a Northrop

employee from his TCS email account asking for job descriptions for openings at Northrop, doc. 85-26 at 4; (3) sent Northrop a draft statement work using his TCS email address, docs. 85-45 at 51; 98 at exh. S; and (4) entered into an agreement with Northrop regarding the scope of work, which mirrored the work Killough did for Northrop as an APL employee, *see* doc. 85-45 at 29.  While Killough may ultimately prove that all of those actions qualify as efforts to secure employment or to prepare to compete with APL after his employment ended, a reasonable jury could find instead that Killough acted to lure Northrop's business away from APL.

## 3.

Finally, Killough contends that APL cannot prove damages.  Doc. 85 at 28-29.  Indeed, Killough's efforts to solicit business from Teledyne Brown and Boeing on behalf of TCS while employed by APL proved unsuccessful, *see* docs. 85-106 at 16-17; 98 at exhs. AA, BB; 85-98 at 30, and APL has not shown that Killough's actions caused it to lose any business from these two companies, *see* 85-93 at 34; 85-98 at 30.  Consequently, in the absence of proof of damages, the breach of fiduciary duty claim related to Killough's attempts to solicit business from those companies fails.[21]  But, questions of fact exist regarding whether Killough's

---

[21] APL contends that it is entitled to recover damages based on the faithless-servant doctrine, which "precludes an employee from receiving compensation for conduct that is disloyal to the employer or in violation of the employee's employment contract."  *Edwards v. Allied Home Morg. Cap. Corp.*, 962 So. 2d 194, 209 (Ala. 2007); *see also* doc. 102 at 28-29.  But, APL pleaded in its counterclaim only that it suffered a "diminished competitive advantage" due to Killough's actions.

interactions with and solicitation of business from Northrop harmed APL.  *See* section III(F).  Accordingly, APL may proceed with its breach of fiduciary duty claim related to Killough's interactions with Northrop.

### J.

APL asserts in Count VI of its counterclaim that Killough breached confidentiality provisions of his employment agreement.  Doc. 51 at 58-61.  Killough challenges the claim by citing his failure to transmit the signed agreement to APL, and his related contention that APL cannot show as a result a meeting of the minds regarding the confidentiality provisions.  Doc. 85 at 35-36.  While Killough did not return the signed contract to APL, he did sign it.  *See* docs. 69 at 5; 84-8; 84-5; 84-6; 85-1 at 24-25.  His signature on it raises a question of fact regarding whether he assented to the confidentiality terms of the agreement.  *See Ex parte Rush*, 730 So. 2d at 1177-78.  Consequently, Killough has not established that he is entitled to summary judgment on the breach of contract claim.[22]

---

Doc. 54 at 57.  The counterclaim gives no notice that it may seek damages based on compensation paid to Killough during the time of his allegedly disloyal conduct.

[22] Killough also contends APL cannot prove damages based on the alleged breach of the confidentiality provisions.  Doc. 85 at 36-37.  But, as discussed above, a question of fact exists regarding whether Killough's alleged misappropriation of APL's confidential documents injured APL.  *See* Section III(F), *supra*.  Moreover, Killough does not address APL's allegation that it has incurred damages in seeking the return of its confidential documents.  *See* doc. 54 at 60.

# K.

Finally, Killough and TCS challenge APL's request for lost profits damages after November 2019.  Doc. 85 at 37.  Under Alabama law, a plaintiff may recover lost profits if the plaintiff shows the lost profits are "the natural and proximate, or direct, result of the breach complained of and [the profits] are 'capable of ascertainment with reasonable, or sufficient, certainty . . . .'"  *Super Valu Stores, Inc. v. Peterson*, 506 So. 2d 317, 327 (Ala. 1987 (quoting *Morgan v. South Central Bell Telephone Co.*, 466 So. 2d 107, 115-16 (Ala. 1985)).  Based on APL's testimony, Killough and TCS contend that APL cannot show that any of their actions have caused APL to incur lost profits since at least November 25, 2019, doc. 85 at 37, the date by which APL asserts it had "graduated into being in [] a business size where [it] wouldn't be competing for <u>some</u> of the same work as TCS because [APL is] a bigger company."  Doc. 85-27 at 61 (emphasis added).  But, that APL and TCS would not compete for "<u>some</u> of the same work" does not establish as a matter of law that APL and TCS never competed for the same work.  As a result, Killough and TCS have not shown at this juncture that APL cannot recover for any lost profits incurred after November 25, 2019.

*     *     *

To summarize, APL may proceed with its counterclaims under the DTSA and ATSA (Count I and II), its breach of fiduciary duty claims related to Killough's

interactions with Northrop (Count V), and its breach of contract claim (Count VI). In all other respects, Killough and TCS's motion for summary judgment is due to be granted.

## IV.

To close, Monkress and APL's motion for summary judgment, doc. 80, is due to be  granted as to the fraudulent misrepresentation and suppression claims (Counts II and III), quantum meruit claim related to net profits in 2010-2014 (Count V), conversion claim (Count VI), and unjust enrichment claim (Count VII).  The motion is due be denied as to Killough and TCS's breach of contract claims (Count I) and quantum meruit claim related to net profits in 2015 (Count V).

Killough's and TCS's motion for summary judgment, doc. 85, is due to be granted as to the following counterclaims:   conversion (Count III); wrongful interference with contractual and business relations (Count IV); and breach of fiduciary duty (Count V) based on the alleged misappropriation of trade secrets, attempt to transfer contracts from APL to TCS, and attempts to solicit business from Teledyne Brown and Boeing.  The motion is due to be denied as to APL's misappropriation of trade secrets under the DTSA and ATSA (Counts I and II), breach of fiduciary duty (Count V) based on Killough's alleged attempts to usurp APL's business with Northrop for TCS, and breach of contract (Count VI) counterclaims.

The court will issue a separate order in accordance with this opinion.

**DONE** the 30th day of March, 2021.

**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE